**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Phyllis Gaither Montague, on behalf of herself and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>Dixie National Life Insurance Company,) and National Foundation Life Insurance Company, )<br><br>Defendants. )<br>_____ ) | C/A No.: 3:09-cv-687-JFA<br><br><br><br><br>**ORDER** |

This matter is before the court on the parties' cross-motions for summary judgment with respect to the Plaintiffs' breach of contract, declaratory judgment, and injunction causes of action, as well as the Plaintiffs' motion for an award of damages. Dixie National Life Insurance Company has also moved the court for summary judgment, based on its belief that an implied novation precludes it from being liable under the policies at issue. After considering the parties' briefs, and welcoming oral argument, the court grants in part and denies in part the Plaintiffs' motion for summary judgment, it denies Dixie National Life Insurance Company's motion for summary judgment, and it awards Plaintiffs damages in an amount to be determined in a separate order.

**BACKGROUND**

In 1992, the named plaintiff Phyllis Gaither Montague contracted with Dixie National Life Insurance Company ("Dixie National") to purchase a supplemental cancer policy, which provided that Dixie National would pay her benefits equal to all of the

"actual charges" of the covered cancer treatment she underwent.[1] Dixie National paid "actual charges" based on the amount a medical provider billed for its services, usually as reflected in the medical provider's bill to its patients. This amount is usually greater than the amount actually received by medical providers as payment for their services because medical providers frequently enter into pre-negotiated agreements with insurance companies that issue primary insurance policies in which they agree to accept a discounted amount as payment-in-full for their services.

Effective December 31, 1993, National Foundation Life Insurance Company ("National Foundation") obtained from Dixie National the supplemental cancer policy it issued Ms. Montague, along with all other similar supplemental cancer policies issued by Dixie National, via an "assumption reinsurance agreement." National Foundation continued to pay Ms. Montague and the other policyholders the "actual charges" of their cancer treatment based on the amount a medical provider billed for his services until late 2001, when it changed its payment practice. Instead of continuing to base "actual charges" on the full list price of healthcare services, it began basing "actual charges" on the pre-negotiated, discounted amounts agreed to be paid by issuers of primary insurance policies. This change in payment practice galvanized policyholders to file suit against Dixie National and National Foundation, and the United States Court of Appeals for the

---

[1] Actually, benefits under Ms. Montague's policy vary as to the procedure performed. The policy contains a "Schedule of Operations," which lists the maximum amount of benefits to be paid for some procedures, and for other covered procedures, the benefits are calculated based on the "actual charge(s)" or "actual fee(s)" for the procedure. In this order, the court's use of the term "actual charges" refers to all of these terms.

Fourth Circuit ultimately resolved the suit in favor of the policyholders in *Ward v. Dixie National Life Insurance Company*, 595 F.3d 164 (2010).

Because this class action suit arises out of the wake of the *Ward* litigation, it is helpful to briefly review the history of that litigation. As just discussed, certain policyholders of the supplemental cancer policy issued by the Defendants filed suit, claiming that the Defendants breached the terms of their supplemental cancer policies by failing to pay "actual charges" based on the amount a medical provider billed them for its services. Because the term "actual charges" was not defined in the policies and because the term, as used in the insurance policies, was patently ambiguous, the Fourth Circuit resolved the ambiguity in favor of the policyholders and directed this court to enter judgment as a matter of law with respect to their breach of contract claims. *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 625–27 (4th Cir. 2007). In response to this decision by the Fourth Circuit, and before this court could follow the Fourth Circuit's mandate, the South Carolina Legislature enacted South Carolina Code section 38-71-242 on June 4, 2008, which defined "actual charges" in the manner advocated by the Defendants, but rejected by the Fourth Circuit. The statute further stated that after its effective date, "an insurer . . . shall not pay any claim or benefits based upon an actual charge . . . in an amount in excess of the 'actual charge' . . . as defined in this section." S.C. Code § 38-71-242(C).

With this law on the books, the Defendants in *Ward* then moved for judgment on the pleadings, arguing that the statute prohibited them from paying "actual charges" as defined by the Fourth Circuit. This court rejected the Defendants' argument by finding

that the statute did not apply retroactively to the *Ward* plaintiffs' claims, and it entered judgment and an award of damages in favor of the plaintiffs. *Ward v. Dixie Nat'l Life Ins. Co.*, No. 3:03-3239, 2008 U.S. Dist. LEXIS 119105 (D.S.C. November 12, 2008); *Ward v. Dixie Nat'l Life Ins. Co.*, No. 3:03-3239, 2008 U.S. Dist. LEXIS 119107 (D.S.C. August 12, 2008). The Defendants again appealed this court's judgment to the Fourth Circuit Court of Appeals, and in its second opinion in the *Ward* litigation, the Fourth Circuit affirmed this court's finding that the newly enacted statute did not retroactively apply to the *Ward* case. In doing so, it held that the legislature had not overcome the presumption against statutory retroactivity and that applying the statute retroactively would raise constitutional separation of powers concerns. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 175–79 (4th Cir. 2010). The Fourth Circuit also upheld this court's award of damages, ending the case. *Id.* at 179–83.

Like the plaintiffs in *Ward*, the Plaintiffs in this suit claim that the Defendants also breached the terms of their supplemental cancer policies, which are identical to those in *Ward*, by failing to pay them the "actual charges" of their cancer treatment, as defined by the Fourth Circuit in *Ward* to be the amount billed a patient by a medical service provider. What distinguishes the class certified in this case from the one certified in *Ward* is the point in time that the policyholders filed a claim under their policies. Although all of the Plaintiffs in this suit entered into their contracts with the Defendants prior to the enactment of section 38-71-242, the claims at issue in this case were not filed by the Plaintiffs until after the statute's enactment on June 4, 2008, unlike the class members in *Ward*, who filed their claims with the Defendants prior to this date. Therefore, while the

Plaintiffs ask the court to grant their motion for summary judgment based on the Fourth Circuit's holdings in *Ward*, the Defendants assert that S.C. Code section 38-71-242 makes the findings of *Ward* irrelevant and defeats the Plaintiffs' breach of contract claim. All of the parties have moved for summary judgment.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Summary judgment should be granted in those cases where it is perfectly clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees of Maryland Community College*, 955 F.2d 924, 928 (4th Cir. 1992). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## ANALYSIS

### I.    Breach of Contract & Declaratory Judgment

The Plaintiffs move the court for an entry of judgment as a matter of law, which would find that the Defendants breached the terms of their supplemental cancer policies by failing to pay the Plaintiffs cash benefits equal to the amount billed by the healthcare

provider for certain treatments, rather than the pre-negotiated amounts accepted as payment for these treatments by the providers from the Plaintiffs' primary insurers or other third-party payor, such as Medicare. To support their motion, the Plaintiffs rely on both of the Fourth Circuit's holdings in the *Ward* litigation, as the Plaintiffs believe those rulings also control the question of liability in this case. Thus, they ask the court to find that the presumption against retroactivity and the doctrine of constitutional avoidance preclude the application of section 38-71-242 to their claims and that the Defendants were obligated to pay them the "actual charges" of their cancer treatments as determined by the Fourth Circuit in its first *Ward* decision. Alternatively, the Plaintiffs ask the court to declare that section 38-71-242 does not apply to their policies because it violates the Contract Clause of the United States and South Carolina Constitutions. In response, the Defendants also move the court for an entry of judgment as a matter of law in their favor, which would find that S.C. Code section 38-71-242 precludes them from being liable under the policies. Pertinent to this case, section 38-71-242 states:

> (A)(1) When used in any individual or group specified disease insurance policy in connection with the benefits payable for goods or services provided by any health care provider or other designated person or entity, the terms ""actual charge", "actual charges", "actual fee", or "actual fees" shall mean the amount that the health care provider or other designated person or entity:
>
>> (a) agreed to accept, pursuant to a network or other agreement with a health insurer, third-party administrator, or other third-party payor, as payment in full for the goods or services provided to the insured;

6

> (b) agreed or is obligated by operation of law to accept as payment in full for the goods or services provided to the insured pursuant to a provider, participation agreement, or supplier agreement under Medicare, Medicaid, or any other government administered health care program, where the insured is covered or reimbursed by such program; or
>
> (c) if both subitems (a) and (b) of this subsection apply, the lowest amount determined under these two subitems;
>
>     . . . .
>
> (B) This section applies to any individual or group specified disease insurance policy issued to any resident of this State that contains the terms "actual charge", "actual charges", "actual fee", or "actual fees" and does not contain an express definition for [those] terms . . . ."
>
> (C) Notwithstanding any other provision of law, after the effective date of this section, an insurer or issuer of any individual or group specified disease insurance policy shall not pay any claim or benefits based upon an actual charge, actual charges, actual fee, or actual fees under the applicable policy in an amount in excess of the "actual charge", "actual charges", "actual fee", or "actual fees" as defined in this section.

S.C. Code Ann. § 31-71-242. To support their motion, the Defendants contend that the court does not have to determine whether section 38-71-242 applies retroactively because, by its terms, the statute applies prospectively to claims submitted after the statute's effective date of June 4, 2008. As this case involves claims submitted after June 4, 2008, the Defendants contend that they complied with the terms of section 38-71-242 and did not breach the terms of their policies.

### a.  The Presumption Against Statutory Retroactivity

The intent of the South Carolina General Assembly determines whether a state statute will have prospective or retrospective application, *Kiawah Resort Assocs. v. S.C. Tax Comm'n*, 318 S.C. 502, 504, 458 S.E.2d 542, 543 (1995), and as the parties are well

aware, both the federal and South Carolina courts utilize a presumption against statutory retroactivity as a means of giving effect to legislative intent. *Ward*, 595 F.3d at 172. "Under this presumption, the courts assume that statutes operate prospectively only, to govern future conduct and claims, and do not operate retroactively, to reach conduct and claims arising before the statute's enactment." *Id.* When determining whether the presumption against retroactivity bars the application of a statute in a given case, courts perform a three-step analysis. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 12 (4th Cir. 2010). First, the court must determine whether the legislature expressly prescribed the statute's temporal reach. *Id.* If so, the presumption against retroactivity does not apply. *Id.* If the legislature has not prescribed the statute's reach, however, a court must then determine whether the new statute would have a retroactive effect if applied to the case at hand. *Id.* If the statute would not have a retroactive effect, the presumption against retroactivity again does not apply to the case. *Id.* But if the statute does have a retroactive effect, the presumption against retroactivity is triggered, and the court must them determine whether the legislature has overcome the presumption with clear congressional intent in favor of retroactivity. *Id.*

Under the first step in the analysis, the court must decide whether the South Carolina General Assembly expressly prescribed the temporal reach of the statute, as opposed to merely its substantive reach. This is a "demanding standard," requiring a prescription that is "truly express and unequivocal." *Ward*, 595 F.3d at 173. Of course, if the General Assembly expressly prescribed the statute's temporal reach to cover the matters being litigated, then "there is no need to resort to judicial default rules." *Landgraf*

*v. USI Film Products*, 511 U.S. 244, 280 (1994). Because the court finds that the General Assembly expressly and unequivocally prescribed section 38-71-242's temporal reach, the presumption against retroactivity and the doctrine of constitutional avoidance do not arise in this case.

As already discussed, the Plaintiffs contend that the court should merely follow the Fourth Circuit's second decision in *Ward* to find that the statute does not apply to their claims. To support their argument, the Plaintiffs quote the following language from court of appeals' opinion:

> Neither the statutory language nor the legislative history evinces any intent to apply the statute's definition to the insurance contracts in this case, and if anything, supports the opposite interpretation.

(Plfs.' Mot. for S.J. at 5) (quoting *Ward*, 595 F.3d at 174). By the use of the term "contracts," rather than the term "claims," the Plaintiffs argue that the court of appeals "chose to exclude all contracts [entered into prior to the statute's enactment date] from the application of Section 38-71-242—not merely claims previously made." (*Id.*) Therefore, because the Plaintiffs negotiated and entered into their supplemental cancer policies with the Defendants prior to section 38-71-242's enactment, they contend that the General Assembly did not express its intent for the legislatively-established definition of "actual charges" to apply to their policies because "[t]o do so would impermissibly give the statute retroactive effect." (*Id.*)

In *Ward*, the Fourth Circuit did conclude that the General Assembly failed to expressly prescribe the statute's temporal reach to apply to the contracts and claims in that suit, but in doing so, the court undeniably focused on whether the General Assembly

had prescribed the statute's reach to cover lawsuits pending prior to its enactment. *Ward*, 595 F.3d at 172 ("Under the first step of the analysis, we must decide whether the South Carolina General Assembly expressly prescribed the reach of the statute. For example, the legislature may avoid triggering the presumption against retroactivity by including an explicit provision stating that the statute governs lawsuits already initiated prior to its enactment."); *id.* at 173 ("The South Carolina statute here contains no such express and unequivocal language specifying whether it applies to lawsuits filed before its enactment, such as this one."); *see also id.* at 178 ("Here the state legislature *did not* apply the statute to this case.) (emphasis in original). The fact that the claims in this case were submitted after the statute's June 4, 2008 effective date makes the issue of the statute's retroactivity different than the issue presented to the Fourth Circuit in its second *Ward* decision. In fact, the Plaintiffs removed themselves from the *Ward* class on November 11, 2008, because of this concern.

As the Defendants argue, the General Assembly clearly expressed the temporal reach of the statute by incorporating the following language into the statute: "*[A]fter the effective date of this statute*, an insurer shall not pay any claim or benefits based upon an 'actual charge' . . . in an amount in excess of the 'actual charge' . . . as defined in this section." S.C. Code Ann. § 38-71-242(C) (emphasis added). Because the General Assembly based the statute's reach on the date the claim for benefits under the applicable policies was made, the Defendants contend the General Assembly expressly and unequivocally prescribed the temporal reach of the statute to cover all claims presented

after June 4, 2008, notwithstanding the fact that the Plaintiffs entered into their policies with the Defendants prior to the statute's enactment.

Also, at the hearing before the court, the Defendants noted that subsection "B" of the statute indicates that the statue "applies to any individual or group specified disease policy *issued* to any resident of [South Carolina] that contains the term[] 'actual charge' . . . and does not contain an express definition for the term[] . . . ." S.C. Code Ann. § 38-71-242(B) (emphasis added). Because "issued" is the past-participle form of the word "issue," the Defendants assert that the General Assembly also expressly and unequivocally prescribed the statute's reach with respect to the policies to which it applies. Therefore, while reading subsection "B" in conjunction with subsection "C", the Defendants contend that the General Assembly intended the statute to apply to claims for benefits submitted after June 4, 2008, pursuant to policies that had been entered into prior to June 4, 2008.

After considering the Defendants' arguments, the court agrees that the General Assembly expressly and unequivocally prescribed the statute's reach to cover the Plaintiffs' claims. In *Martin v. Hadix*, 527 U.S. 343 (1999), the Supreme Court addressed a similar issue involving the Prison Litigation Reform Act of 1995. The case arose out of a two class action lawsuits challenging the conditions of confinement in the Michigan prison system. By 1987, both classes of prisoners had won their suits, and the court had awarded attorneys' fees for the post-judgment monitoring of the Michigan Department of Corrections' compliance with the court's remedial orders. Furthermore, the parties had

established a system for awarding those fees on a semiannual basis, and the court had

established specific market rates for the attorneys' fees to be set at $150.00 per hour.

Then, on April 26, 1996, the Prison Litigation and Reform Act became effective,

and § 803(d)(3) of the Act limits the fees that may be awarded to attorneys who

successfully litigate prisoner lawsuits. It specifically stated:

> (d) Attorney's fees
>
> (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. § 1988], such fees shall not be awarded, except to the extent [authorized here].
>
>     . . . .
>
> (3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U.S.C. § 3006A (1994 ed. and Supp. III)], for payment of court-appointed counsel.

*Id.* at 350 (citing § 803(d), 42 U.S.C. § 1997e(d) (1994 ed., Supp. II)). In effect, this

section decreased the attorneys' fees in the cases from $150.00 per hour to $112.50 per

hour. When the attorneys who represented the prisoner classes filed their semiannual fee

request for services performed between January 1, 1996 and June 30, 1996, the issue

arose as to whether or not the requests were subject to §803(d)'s cap on attorney's fees.

The Supreme Court ultimately concluded that §803(d) limited attorney's fees with

respect to post-judgment monitoring services performed after the Act's effective date, but

it did not limit fees for post-judgment monitoring performed before the effective date.

In reaching this conclusion, the Court first reviewed the explicit language of

§803(d) to determine if Congress had expressly mandated the temporal reach of the

statute. The Michigan Department of Corrections argued that Congress had in fact expressly mandated that the statute cover claims submitted after the Act's effective date, even for services performed prior to that date. To support its argument, it cited the two following phrases: (1) "[I]n any action brought by a prisoner who is confined [to a correctional facility] . . . attorney's fees . . . shall not be awarded, except [as authorized by the statute]," and (2) "no award of attorney's fees . . . shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U.S.C. § 3006A], for payment of court-appointed counsel." *Martin*, 527 U.S. at 353. The Corrections Department believed that "'any' is a broad encompassing word and that Congress's use of the word 'brought,' a past-tense verb, demonstrates congressional intent to apply the fees limitations to *all* fee awards entered after the [statute] became effective, even when those awards were for services performed before the [statute] was enacted." *Id.* (emphasis in original). It appears that the Corrections Department further argued that the use of the phrase "no award" in §803(d)(3) expressed congressional intent to apply the section to all attorney's fee awards entered after the Act's effective date. The Court disagreed.

It determined that the provisions of the Act cited by the Corrections Department failed to expressly prescribe §803(d)'s temporal reach. *Id.* at 355. The Court advised:

> Had Congress intended § 803(d)(3) to apply to all fee orders entered after the effective date, even when those awards compensate for work performed before the effective date, it could have used language more obviously targeted to addressing the temporal reach of that section. It could have stated, for example, that 'No award entered after the effective date of this Act shall be based on an hourly rate greater than the ceiling rate.'

> The conclusion that § 803(d) does not clearly express congressional intent that it apply retroactively is strengthened by comparing § 803(d) to the language that we suggested in *Landgraf* might qualify as a clear statement that a statute was to apply retroactively: 'The new provisions shall apply to all proceedings pending on or commenced after the date of enactment.' *Id.*, at 260 (internal quotation marks omitted). This provision, unlike the language of the PLRA, unambiguously addresses the temporal reach of the statute. With no such analogous language making explicit reference to the statute's temporal reach, it cannot be said that Congress has 'expressly prescribed' § 803(d)'s temporal reach. *Id.*, at 280.

*Id.* at 354–55. Here, of course, the General Assembly did in fact incorporate such language into section 38-71-242. Subsection "C" states that "*after the effective date of this section*, an insurer or issuer of any . . . specified disease insurance policy *shall not pay any claim or benefits* based upon an actual charge . . . under the applicable policy in an amount in excess of the 'actual charge' as defined in this section," and subsection "B" makes clear that the this directive "applies to *any* . . . specified disease insurance policy *issued* to any resident of [South Carolina] . . . that contains the term[] 'actual charge' . . . and does not contain an express definition for the term[] . . . ." S.C. Code Ann. §38-71-242(B) & (C) (emphasis added). The Defendants in this case issued the Plaintiffs certain specified disease insurance policies, which incorporated the term "actual charges," but which also failed to define that term. Furthermore, all of the Plaintiffs presented their claims and lawsuit after the statute's effective date, thereby invoking the statute's definition of "actual charges." Moreover, the court cannot overlook the fact that the General Assembly pushed this law onto the books as an immediate reaction to the Fourth Circuit's first decision in *Ward.* Therefore, the court finds that the General Assembly did expressly prescribe the statute's temporal reach to cover the claims presented by the

Plaintiffs, as it clearly expressed its intent for insurers of specified disease policies to pay post-June 4, 2008 benefits based on the legislatively-established definition of "actual charges". This seems to be the only plausible interpretation of the statute. *See Lindh v. Murphy*, 521 U.S. 320, 329 n.4 (1997) (noting that the cases where the Supreme Court has found truly retroactive effect adequately authorized by a statute have involved statutory language that was so clear that it could sustain only one interpretation).

### b. <u>The Doctrine of Constitutional Avoidance</u>

The Plaintiffs also argue that the doctrine of constitutional avoidance should preclude the court from finding that the statute applies to the claims of this case. This doctrine is premised on the "'reasonable' notion that legislatures do not intend an interpretation which raises serious constitutional doubts." *Ward*, 595 F.3d at 164. While the statute may apply prospectively to claims filed under the applicable supplemental cancer policies, the statute's definition of "actual charges" will retroactively alter a term used in policies issued prior to the statute's enactment, giving rise to a potential Contract Clause violation. Thus, the Plaintiffs contend that the court should invoke the doctrine of constitutional avoidance to construe the statute so as not to apply to their policies in order to avoid this "grave constitutional concern." (Plfs.' Reply to Mot. for S.J. at 7–8.) The court agrees with the Plaintiffs' assertions generally, but once the General Assembly makes its intention clear, the court is no longer to ascribe to default judicial rules. *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). As discussed in the analysis above, the court has found that the statute contains clear statements of the General Assembly's intent for section 38-71-242 to apply to the Plaintiffs' claims; therefore,

neither this doctrine nor the presumption against statutory retroactivity are invoked in this case.

### c.  <u>The Contract Clause</u>

Simply because the legislature intends for a statute to apply retroactively does not conclude the analysis. For "[i]n many cases, retroactive legislation risks violating those provisions of the Constitution in which the antiretroactivity principle finds expression," *Ward*, 595 F.3d at 176, and in this case, the Plaintiffs believe section 38-71-242 violates the Contract Clause of the United States and South Carolina Constitutions, as it applies to their policies. The Contract Clause states, "No State shall . . . pass any . . . law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.[2] As interpreted, the Clause does not apply to limit the ability of state and local governments to regulate the terms of future contracts; its scope only covers government interference with already existing contracts. *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 295–96 (1827). To analyze whether or not government interference with a private contract violates the Contract Clause, a court must first determine if there is "a substantial impairment of a contractual relationship." *Energy Reserves Group v. Kan. Power & Light*, 459 U.S. 400, 411 (1983); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). If so, the court must then determine if the state can justify the impairment by demonstrating that the impairment serves a "significant and legitimate" public purpose. *Id.* at 412. If the

---

[2] South Carolina's Constitution also contains a Contract Clause, which bars the State from passing laws that impair the obligations of contracts, S.C. Const. art. I, § 4, and the South Carolina Supreme Court has followed federal precedent construing the federal Contract Clause in interpreting the Contract Clause of the South Carolina Constitution. *Ken Moorhead Oil Co., Inc. v. Federated Mut. Ins. Co.*, 232 S.C. 532, 539, 476 S.E.2d 481, 485 (1996).

state can make this showing, the court must then assess whether the state law is reasonably related to achieving the stated public purpose. *Id.* at 413; *Allied Structural Steel Co.*, 438 U.S. at 245. As this analysis makes clear, "[o]nly if there is a contract, which has been substantially impaired, and there is no legitimate public purpose justifying the impairment, is there a violation of the Contract Clause." *City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 391 (4th Cir. 1995).

### i. <u>Substantial Impairment of an Existing Contractual Relationship</u>

The first inquiry in the analysis—whether or not there is a substantial impairment of a contractual relationship—typically has three components: (1) whether there is a contractual relationship, (2) whether a change in law impairs that contractual relationship, (3) and whether the impairment is substantial. *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). There is no real dispute between the parties as to the first two factors. All of the Plaintiffs entered into their supplemental cancer policies with the Defendants by the early 1990s, and they had a right to continue the policies during their lifetime by timely payment of the required premiums, which they have elected to do. Furthermore, section 38-71-242 does impair this contractual relationship by defining a critical term used in the supplemental cancer policies in a way that lessens the amount of benefits the Plaintiffs shall receive. Therefore, the court must determine whether section 38-71-242's impairment of the Plaintiffs' policies is substantial. In regard to this factor, the Fourth Circuit has explained:

> In determining whether an impairment is substantial and so not 'permitted under the Constitution,' of greatest concern appears to be the contracting parties' actual reliance on the abridged contractual term.

> Specifically, the Supreme Court has examined contracts to determine whether the abridged right is one that was 'reasonably relied' on by the complaining party, *Spannaus* , 438 U.S. at 246, or one that 'substantially induced' that party 'to enter into the contract.' *City of El Paso v. Simmons*, 379 U.S. 497, 514 (1965); *see also United States Trust*, 431 U.S. at 20 n.17. *See generally Baltimore Teachers Union*, 6 F.3d at 1017-18 and n.7. When assessing whether there has been the requisite reliance, the Court has looked to objective evidence of reliance.

*City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 392 (4th Cir. 1995). In conducting this analysis, the courts have looked to (1) the terms of the contract "to determine whether the contract—either explicitly or implicitly—indicated that the abridged term was subject to impairment by the legislature;" (2) whether the industry has been regulated in the past; (3) how the contract has been changed, as "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement[;]" and (4) "the character of the abridged right—whether it was by its nature the central undertaking or primary consideration of the parties." *Id.* at 392–94 (internal citations and quotations omitted).

In this case, the Plaintiffs contend that the statute does substantially impair their policies because it lessens the benefits they bargained for and are entitled to under the Fourth Circuit's first decision in *Ward*. The Defendants contend that the statute does not substantially impair the Plaintiffs' supplemental insurance policies because they do not believe the Plaintiffs had a reasonable expectation or vested right to receive benefits in an amount equal to what their medical providers billed them for their cancer treatment. *See Ken Moorhead Oil Co., Inc. v. Fed. Mut. Ins. Co.*, 323 S.C. 532, 542, 476 S.E.2d 481,

486–87 (1996) ("For purposes of Contract Clause analysis, a statute can be said to substantially impair a contract when it alters the reasonable expectations of the contracting parties.") (citing *Energy Reserves Group, Inc. v. Kansas Power & Light, Co.*, 459 U.S. 400, 411 (1983)). To support their assertion, the Defendants raise several points.

First, they contend that the statute does not impact any of the Plaintiffs' reasonable expectations of the benefits payable under the policies because the term "actual charges" was ambiguous, as determined by the Fourth Circuit in *Ward*. Because the term was ambiguous, the Defendants do not believe the Plaintiffs could have legitimately expected to receive a certain amount of benefits based on the presence of the non-defined term in the policy. The court finds little merit to this argument. As already mentioned, all of the Plaintiffs entered into their policies with the Defendants by the early 1990s, and for the next decade, until approximately the end of 2001, the Defendants paid "actual charges" based on the amount a medical provider billed for its services. National Foundation's unilateral decision to change its payment practice to base "actual charges" on the lesser, pre-negotiated amount received by medical providers from the Plaintiffs' primary insurers gave rise to this eight-year litigation because it upset the expectations of the policyholders. Moreover, the Fourth Circuit's first opinion in the *Ward* litigation, which it issued on May 23, 2007, determined that the term "actual charges," as used in the Plaintiffs' policies, equaled the amount the Plaintiffs' medical providers billed them for cancer treatment. The Plaintiffs of this case were a part of that decision, as they did not remove themselves from the *Ward* class until November 12, 2008, after the General Assembly enacted section 38-71-242. Therefore, if the Defendants course of conduct did

not create a reasonable expectation as to the benefits payable under the policies, the Fourth Circuit's May 23, 2007 decision in *Ward* certainly did. Based on these factors, the court does not find that the Plaintiffs are precluded from claiming a reasonable expectation as to the performance of the policy merely because the term "actual charges" was not defined in the policies.

To further show that the Plaintiffs could not have had a reasonable expectation in receiving benefits equal to the amount billed by their medical providers, the Defendants argue that the policies in question made it clear to the Plaintiffs that the policies' terms were subject to the laws of South Carolina. The Defendants support this argument by citing to the "Conformity With State Law" provision contained in the policies, which states, "This policy is subject to the laws of the state where the application was signed. If any part of the policy does not comply with the law, it will be treated by us as if it did." (*Id.*, Ex. C. at 9.) This provision, argues the Defendants, evinces the parties' understanding that the terms of the policies could change if South Carolina law changed them. To the extent the Defendants attempt to assert that this provision specifically memorializes the parties' acknowledgement that the amount of the benefits issued under the policy could be altered by the South Carolina General Assembly, the court disagrees, and it does so for several reasons.

First, the provision appears to be a combination of a choice-of-law provision, as well as a form of a savings clause in the event that part of the policies violated South Carolina law. *See Smith v. Lincoln Benefit Life Co.*, No. 08-1324, 2009 U.S. Dist. LEXIS 24941, at *17–21 (W.D. Pa. March 23, 2009) (interpreting an identical "conformity with

state law" provision of an insurance policy to be a narrow choice-of-law provision). Thus, the court does not construe the provision to be so precise as to forewarn the Plaintiffs that the benefits payable under their policies could be altered by the General Assembly. This is especially true in light of the "Premium Adjustment" section of the policy, which states, "Only the premium can be adjusted, we cannot modify the benefits provided by this policy while it continues in force." (Defs.' Mot. for S.J., Ex. C. at 9.) Therefore, with the policies ensuring the Plaintiffs that their benefits would never be modified, and without a more specific provision clearly demonstrating the parties' understanding that the benefits could be modified by state law, the court does not find that the "Conformity With State Law" provision of the policies precludes the Plaintiffs from claiming a reasonable expectation in receiving benefits equal to the Fourth Circuit's definition of the term "actual charges" in *Ward*.

To compare, had the policy contained provisions similar to those found in the contracts examined by the United States Supreme Court in *Energy Reserves Group, Inc. v. Kansas Power & Light, Co.*, 459 U.S. 400 (1983), the Defendants' argument may carry more weight. In that case, the contracts in question, which were for the sale of natural gas, contained (1) a governmental price escalator clause, which provided that if a governmental authority fixed a price for any natural gas that is higher than the price specified in the contract, the contract price shall be increased to that level; (2) a price redetermination clause, which gave the gas supply company the option to have the contract price redetermined not more than once every two years; as well as (3) the following provision: "Neither party shall be held in default for failure to perform

hereunder if such failure is due to compliance with any relevant present and future state and federal laws." *Energy Reserves Group, Inc.*, 459 U.S. at 403–05. Based on the presence of these provisions in the contract, the Court observed, "In drafting each of the contracts, the parties included a statement of intent which made clear that the escalator clause was designed to guarantee price increases consistent with *anticipated* increases in the value of [the] gas." *Id.* at 415 (emphasis in original). The Court further stated:

> Moreover, the contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law. This latter provision could be interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim. Regardless of whether this interpretation is correct, the provision does suggest that ERG knew its contractual rights were subject to alteration by state price regulation. Price regulation existed and was foreseeable as the type of law that would alter contract obligations . . . In short, ERG's reasonable expectations have not been impaired by the Kansas Act.

*Id.* at 416; *see also City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 392 (4th Cir. 1995) (noting that legislation enacted after certain bond contracts were formed may not have impaired, much less substantially impaired, the contracts when they expressly stated that the city's enforcement authority is limited to that authorized by the laws of the state, and the rules and regulations of the Public Service Commission).

In stark contrast to the contractual provisions present in *Energy Reserves Group, Inc.*, the policies here stated that the benefits would not be modified by the Defendants, and no other provision reveals any expectation or anticipation by the parties that the benefits under the policy could be altered by the State at a later date. Therefore, the court does not find that the "Conformity With State Law Provision" clearly expressed the

parties' expectation that state law might possibly regulate in the future the amount of benefits to be paid under the policies, such that the Plaintiffs could not claim a reasonable expectation in receiving benefits in conformance with the Fourth Circuit's definition of "actual charges." The court finds this especially true considering the important character of the term altered in the policies by section 38-71-242. The coverage and benefits payable under any insurance policy, no matter the type, are of primary importance to any policyholder, as well as the underwriter. This is especially so for individuals who purchase supplemental insurance policies in an effort to protect their income and savings from expenses that are not covered by their primary health insurance policies, making their reliance on the amount of benefits to be paid under the policies vital to their financial planning. In this way, the right to a certain amount of benefits is the type of factor that must have substantially induced the Plaintiffs to enter into the supplemental insurance policies with the Defendants. As such, the general terms of a commonplace provision placed at the end of the Defendants' policies cannot be said to have placed the Plaintiffs on notice that the benefits payable pursuant to those policies may or may not be changed by the South Carolina General Assembly. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248 (1978) ("Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.").

Finally, and somewhat in conjunction with their argument based on the "Conformity With State Law Provision," the Defendants contend that the Plaintiffs could

not reasonably expect the benefits under their policies never to be impacted by state law because the business of insurance is an industry heavily regulated by the State. To be sure, the insurance business is heavily regulated by the State of South Carolina, *see Ken Moorhead Oil Co., Inc. v. Fed. Mut. Ins. Co.*, 323 S.C. 532, 541, 476 S.E.2d 481, 486 (1996) (noting that the insurance field is highly regulated), and one factor to consider in determining whether an impairment to a contract is substantial is whether "the parties are operating in a heavily regulated industry." *Energy Reserves Group, Inc.*, 459 U.S. at 413. But regulation in an industry generally does not offer a state an impenetrable shield from claims that it has violated the Contract Clause. As the courts have explained, "It is certainly the case that a party who has 'purchased into an enterprise already *regulated in the particular* to which he now objects' cannot claim *Contract Clause* protection in that particular." *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1007 (4th Cir. 1980) (quoting *Veix v. Sixth Ward Building & Loan Ass'n*, 310 U.S. 32, 38 (1940) (emphasis added)). This language makes it clear that only if the state has regulated in the particular manner complained of should the court find that the complaining party could not have had a reasonable expectation that his or her contractual relationship would never be modified by future state regulation. The court believes the Fourth Circuit's decision in *Garris v. Hanover Ins. Co.*, 630 F.2d 1001 (4th Cir. 1980), illuminates this point.

In *Garris*, an insurance company and an insurance agent entered into an agency agreement, which permitted either party to unilaterally terminate the agency for any reason upon sixty days written notice. *Garris*, 630 F.2d at 1003. After entering into this contract, the South Carolina General Assembly passed the South Carolina Automobile

Reparation Reform Act of 1974, which, among other things, precluded insurers of automobile insurance from canceling its representation by an agent primarily because of the volume of automobile insurance placed with it by the agent on account of the Act's mandate. *Id.* When the insurance company later sought to terminate its contract with the insurance agent, the agent argued that the termination violated the Act. *Id.* In response, the insurance company argued that the retroactive application of the Act violated the Contract Clause in that it substantially impaired its contractual relationship with the agent by affecting its right to terminate the agency for any reason. *Id.* at 1004. In analyzing whether the Act substantially impaired the contract by its retroactive application, the court addressed the agent's argument that because of the regulated nature of the insurance industry the insurance company had no rightful expectation that its private contractual relationship would not be subject to legislative alteration. *Id.* at 1006–07.

The Fourth Circuit recognized that the regulated nature of an industry is a factor to consider in its analysis, but it also explained that the regulation must cover the particular contractual right impaired. It stated:

> But while it is indisputable that in South Carolina, as elsewhere, the insurance industry has traditionally been subjected to state regulation, there is no indication that the particular contractual relationship here involved has, as such, ever been caught up in the general scheme of regulation. Rather, the company-agency contractual relationship seems itself to have been outside the range of state regulatory interest. Certainly there was no regulation of the contractual relationship in place when [the insurance company] and [the agent] entered into their agency contract.

*Id.* at 1007. Therefore, the court found that the insurance company could have had a rightful expectation that its private contractual relationship would not be subject to

legislative alteration despite the fact that it was in the insurance business. The court ultimately concluded that the Act violated the Contract Clause, as it applied to the agency agreement in question. *Id.* at 1011.

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983), is another case that focused on the regulated nature of the industry in question to determine if an impairment to a contract was substantial. As discussed above, the parties in that case had entered into a contract for the sale of natural gas, which contained a governmental price escalator clause. The escalator clause provided that if a governmental authority fixed a price for any natural gas that was higher than the price specified in the contract, the contract price was to be increased to that level. After the contracts were entered into, the Kansas Legislature, pursuant to federal legislation, enacted a statute that forbid the consideration of ceiling prices set by federal authorities in the application of governmental price escalator clauses. Upon the statute being challenged on the basis that it violated the Contract Clause, the Supreme Court upheld the constitutional validity of the state statute.

In doing so, it found it significant that the state's authority to regulate natural gas prices was well established. *Id.* at 413. Although Kansas did not regulate natural gas prices specifically at the time the contracts in question were executed, *id.*, it had attempted to regulate the wellhead price of natural gas by that time and the federal government had regulated the prices of natural gas in the interstate market, *id.* at 414 n.17. Moreover, by the time the parties entered into their contractual relationship, the Supreme Court had long recognized the validity of state regulation of the production and

sale of natural gas in furtherance of conservation goals. *Id.* at 414 n.15 (citing *Ohio Oil Co. v. Indiana*, 177 U.S. 190 (1900) and *Henderson Co. v. Thompson*, 300 U.S. 258 (1937), among other cases). The Court proceeded to note that the regulation of the sale of natural gas was so extensive that the governmental price escalators incorporated into the contracts evidenced the parties' anticipation that the natural gas prices would be affected by governmental regulation, as already discussed above. *Id.* at 415. Also already discussed, the contracts expressly stated that their terms are subject to relevant present and future state and federal law. *Id.* at 416. Thus, the Court found that the statute's enactment did not upset any reasonable expectation of the contracting parties so as to constitute a substantial impairment to their contractual relationship. *Id.*

Here, although the State of South Carolina has given the authority to regulate the minimum standards for benefits offered pursuant to specified disease insurance policies to the Department of Insurance, *see* S.C. Code. Ann. § 38-71-540, the court has not been made aware of any attempt by the General Assembly prior to the enactment of section 38-71-242 to regulate the maximum amount of benefits payable under supplemental insurance policies. Nor is the court aware of any other statute or regulation whose sole purpose is to define a term of art or to alter the definition of a term of art employed by insurance companies in their policies. *See Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 625 (4th Cir. 2007) ("We conclude that a person who is cognizant of the customs, practices, usages and terminology as generally understood in the health insurance industry would regard 'actual charges' as a term of art rather than two words to be separately defined.") (internal quotation and citation omitted). Nor are the benefits

provided under the Defendants' policies in any way associated with a state-supported fund or insurance pool. *See Ken Moorehead Oil Co., Inc. v. Federated Mutual Insurance Co.*, 323 S.C. 532, 542, 476 S.E.2d 481, 487 (1996) ("Federated cannot dictate through its private contracts how a state-administered fund must be disbursed, which, as we view it, is what Federated attempted to do through its Coordination of Benefits clause.") (footnote omitted). Therefore, the court does not find that the General Assembly had regulated the insurance business in this particular way to preclude the Plaintiffs from reasonably expecting that their private contractual agreement to a certain amount of supplemental benefits would not be subject to legislative alteration.

The court finds the Plaintiffs' expectations especially reasonable in light of the fact that the legislatively-established definition of "actual charges" appears to directly contradict the industry-wide usage of the term of art, as it existed at the time of the parties' contracting and as it is presently understood. For example, a review of the glossary of terms made available to users of the BlueCross BlueShield of South Carolina website reveals the following definition of the term "actual charge":

> Actual Charge – The amount a doctor or other health care provider actually bills a patient. You often see the phrase, "The actual charge may be different from the allowable charge." This means your health plan may only cover a portion of what your doctor charges you. For example, your doctor bills you $35.00 for an office visit. This is the actual charge. But your health plan may only accept $32.00 for an office visit. This is the allowable charge.

BlueCross BlueShield of South Carolina, Understanding Your Coverage, Glossary (June 8, 2011), http://www.southcarolinablues.com/members/understandingyourcoverage/glossary.aspx; *see, e.g.*, Delaware Healthcare Association, Glossary of Health Care Terms

and Acronyms, (June 8, 2011), http://www.deha.org/Glossary/GlossaryA.htm#top (defining "actual charge" to mean "The amount a physician or other provider actually bills a patient for a particular medical service, procedure or supply in a specific instance. The actual charge may differ from the usual, customary, prevailing, and/or reasonable charge."); Health Insurance Online, Insurance Dictionary (June 8, 2011), http://www.online-health-insurance.com/health-insurance-resources/dictionary/actual-charge.htm (defining "actual charge" to mean "The actual amount charged by a physician for medical services rendered."). This is compared to BlueCross BlueShield of South Carolina's definition of the term "Allowable Charge," which is:

> Allowable Charge – The most your health plan will pay for a covered service. You may see the phrase, 'The actual charge may be different from the allowable charge.' This means your health plan may only cover a portion of what your doctor charges you. For example, your doctor bills you $35.00 for an office visit. This is the actual charge. But your health plan may only accept $32.00 for an office visit. This is the allowable charge.

*Id.*; *see also* HealthCare.gov, Glossary (June 8, 2011), http://www.healthcare.gov/glossary/a/allowedcharge.html (defining "Allowed Charge" to mean, "Discounted fees that insurers will recognize and pay for covered services. Insurers negotiate these discounts with providers in their health plan network, and network providers agree to accept the allowed charge as payment in full. Each insurer has its own schedule of allowed charges."); Innovative Solutions Agency, Inc., Michigan Benefits Navigator, Glossary (June 8, 2011), http://www.innovativesolutionsagency.com/michigan-benefits-navigator/glossary (defining "Actual Charge, as "The dollar amount a health care provider bills to a patient for a particular medical service or procedure," and "Approved

Charge" as "The dollar amount on which a health carrier bases its payments and your co-payments. This may be less than the actual charge."). And of course, in *Ward*, the Fourth Circuit recognized several health care dictionaries that define "actual charge" as the amount billed by the medical provider. *Ward*, 257 F. App'x at 625–26 (citing *Mosby's Medical, Nursing, and Allied Health Dictionary* 26 (4th ed. 1994) and Lee Hyde, *The McGraw-Hill Essential Dictionary of Health Care* 133 (1998)).

Based on this industry-wide understanding of the term at the time the Plaintiffs entered into their supplemental cancer policies with the Defendants, which was the definition of "actual charges" ultimately adopted by the Fourth Circuit in the *Ward* litigation prior to section 38-71-242's enactment, along with the fact that the Defendants originally paid benefits in compliance with this industry-wide understanding of the term "actual charges," and the fact that the Defendants promised not to modify the benefits payable pursuant to the policies while they continued in full force, the court finds that the Plaintiffs did have a reasonable expectation to receive benefits under their policies equal to the amount billed by their medical providers during the life of their policies. Notwithstanding the General Assembly's authority to regulate the insurance business, the court is not aware of any statute or regulation enacted prior to section 38-71-242's enactment that would have put the Plaintiffs on notice of the State's ability and willingness to alter the terms of supplemental insurance policies as they were agreed to and understood to exist prior to June 4, 2008, especially when the legislative alteration is not merely a technical alteration, but affects an important term used in the policies.

Therefore, the court finds that section 38-71-242 substantially impairs the Plaintiffs' contractual right to benefits equal to the amount billed by their medical provider.

### ii.  Legitimate Public Purpose

Having found that section 38-71-242 does substantially impair the Plaintiffs' contractual rights, the court must next balance this significant impairment against the state's interest in exercising its police power. *Energy Reserve Group, Inc.*, 459 U.S. at 410. As the Supreme Court has noted:

> If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general economic problem. Furthermore, since *Blaisdell*, the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation. One legitimate state interest is the elimination of unforeseen windfall profits. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.

> Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

*Id.* at 411–12 (internal citations and quotations omitted). Based on this analysis, the Supreme Court has listed five factors for courts to review when making these determinations: (1) Is the statute an emergency measure?; (2) Is the statute intended to protect basic societal interest, rather than particular individuals?; (3) Is it tailored appropriately to its purpose?; (4) Does it impose reasonable conditions?; and (5) Is the

statute limited to the duration of the emergency? *Id.* at 410 n.11 (citing *Home Bldg. &*

*Loan Assn. v. Blaisdell*, 290 U.S. 398, 444–47 (1934).

The Defendants contend that section 38-71-242 has a legitimate public purpose,

and they refer to the Department of Insurance's Bulletin number 2008-15 for their stated

reasons. The Bulletin, which was provided to the Plaintiffs, states:

> Section 38-71-242 is based upon the same legal and public policy
> considerations upon which the Department has continuously relied in
> interpreting the term 'actual charges' in supplemental disease policies. The
> statute embodies the basic principle of insurance, codified at S.C. Code
> Ann. § 38-1-20[25], that insurance is a contract of indemnification, and that
> an insured must suffer an actual out-of-pocket loss to receive payment of
> benefits. This construction of the term 'actual charges' ensures that a few
> insureds and beneficiaries do not receive windfalls in the form of payments
> of benefits greater than sums actually paid to health care providers, either
> by insureds or beneficiaries, or by a primary health insurer. Such windfalls
> inevitably would cause premiums to increase exponentially for all and
> would restrict the availability and affordability of supplemental disease
> policies, to the detriment of the citizens of this state. Finally, the statute
> comports with the Department's consistent position that allowing payment
> of benefits in excess of amounts actually paid to health care providers
> creates opportunities for fraudulent conduct, such as deliberately inflating
> medical bills solely for the purpose of allowing an insured or beneficiary to
> collect greater benefits under a supplemental disease policy.

(*Id.*, Ex. B. at 6.) Based on the reasons of keeping premiums for supplemental policies

affordable and protecting against fraud, the Defendants contend there are legitimate

public purposes behind section 38-71-242. Of course, the Plaintiffs disagree. They

contend that the Department of Insurance's Bulletin is not a proclamation of public

policy; rather, it is the "departmental interpretations of South Carolina insurance laws and

regulations," and only provides "guidance on the Department's enforcement approach."

(*See Id.*, Ex. B. at 7 n.1.) The Plaintiffs further contend that section 38-71-242 is not an

emergency measure taken to regulate the insurance industry, but is merely an attempt to alter the terms of a specific group of insurance contracts, as the legislation was guided through the General Assembly by the Defendants' lobbyists specifically to reverse the Fourth Circuit's first decision in *Ward* and to help the Defendants avoid their contractual obligations. (Plfs.' Mem. in Opp. at 8.)

After carefully considering the issue, the court finds that there is not a legitimate public purpose behind section 38-71-242 to justify the substantial impairment it imposes on the Plaintiffs' rights under their existing supplemental insurance policies. There has been no showing that this legislation is an emergency measure or that it serves a broader, public purpose. Rather, it appears that this legislation merely protects the Defendants' private interests, as section 38-71-242 applies only to specified disease policies, like the Defendants', that do not expressly define the term "actual charge," and it does not apply to other types of supplemental insurance policies. Also, if an insurance company elects to define the term "actual charge" in its specified disease policy, then the statute does not apply, thereby permitting insureds and insurers to thwart the statute and its purported public purposes. The court believes this fact reflects the limited focus of the legislation and contradicts any notion that the statute serves the broader public policies of making supplemental insurance policies affordable or protecting against fraud. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248 (1978) (finding that a Minnesota statute benefited a narrow class, as opposed to protecting a broad societal interest, when the statute applied only to private employers who had at least 100 employees and who had established voluntary private pension plans, and only when those employers closed

their Minnesota offices or terminated their pension plans). Moreover, as noted above, certain insurers understand the term "actual charges" to be the amount billed by a medical provider; therefore, at least to some extent, this legislation will in no way regulate the insurance industry.

There also does not appear to be an emergency situation, either permanent or temporary, arising out of the facts of this case. For years, the Defendants paid benefits based on what their specified disease policyholders were billed by their medical service providers; therefore, it is a stretch to contend that the Defendants now need protection from the terms of the adhesion contracts they issued the Plaintiffs. Had the insurance company sought to be contractually obligated to pay benefits equal to the allowed charges of their policyholders' primary insurers, it could have easily done so. Instead, they based their policies' benefits on the actual charges billed by the Plaintiffs' medical providers, and when they no longer preferred that contractual arrangement, they unilaterally altered their payment practice, despite the fact that their policies forbid them to. And when that attempt failed in the courts, they summoned the General Assembly to legislatively contract for them. All the while, the Defendants have the right to increase the premium payment for the Plaintiffs' policies to help offset any unexpected increase in benefits payable on the policy, which they have done on at least ten occasions. (Defs.' Mot. for S.J., Ex. A., Turner Aff. ¶ 5.) Therefore, there has been no showing that section 38-71-242's alteration of the meaning of "actual charges" in the Plaintiffs' policies was necessary to meet an important societal problem related to the affordability of specified disease policies going forward.

In finding that section 38-71-242 does not support a legitimate public purpose, the court acknowledges the Defendants and Department of Insurance's concern that, without the legislative-definition of "actual charges," the Plaintiffs receive a windfall in the form of payments of benefits greater than the amount actually paid to a health care provider by another health insurer or third-party administrator for the covered treatment. The court, however, finds this concern misplaced in the context of this case. This is because the legislation in question involves supplemental insurance policies, as opposed to primary insurance policies. Supplemental insurance policies pay cash benefits directly to the policyholders, as opposed to primary insurance policies that pay benefits directly to a third-party health care provider. The reason for this difference lies in the purpose of the policies. Through primary insurance policies, insurance companies agree to pay a doctor for the treatment he or she provided an insured. Through supplemental insurance policies, the insurance companies agree to pay the insureds cash. Moreover, insureds of supplemental insurance policies are permitted to use the cash benefits in any manner they desire. For example, the Plaintiffs could use the cash received from the Defendants' supplemental insurance policies to pay for deductibles; to pay for normal living expenses, such as a car payment or a mortgage or rent payment; to pay for travel and lodging expenses accrued when receiving treatment away from their homes; to pay for household help; to pay for out-of-network specialists; etc. Therefore, the benefits under specified disease policies have nothing to do with how much a particular cancer treatment may cost because the benefits issued under those policies are not used to pay for the covered treatment. Because there is no rational relationship between these two, the Department of

Insurance's concern about the Plaintiffs receiving a windfall in the form of a payment of benefits greater than sums actually paid to health care providers is misplaced.

An example of a windfall would be if the Plaintiffs received monetary benefits under a *primary* health insurance policy beyond the true cost of their cancer treatment, for primary health insurance policies typically agree only to pay for the treatment itself. Stated differently, primary health insurance policies do not contain a two-fold promise: a promise to pay for the medical treatment and a promise to provide its policyholders with additional monetary relief to alleviate any financial strains arising collaterally from the medical problem. That is the purpose of the supplemental insurance policy—to give individuals the right to receive additional cash benefits to cope with the myriad of other costs and expenses that arise from their battle with cancer, but are not covered by their primary health insurance policies. Understanding the role of supplemental insurance in this way, there can never be a windfall for the Plaintiffs under their supplemental specified disease policies. The Plaintiffs pay their premiums in an amount agreed to by the parties, and the Defendants pay the Plaintiffs the amount cash benefits that corresponds to the covered procedure as agreed to by the parties. In this two-party arrangement, the term "actual charge" was the agreed upon means by which to determine the correct amount of cash benefits to be paid to the Plaintiffs for certain covered procedures on a case-by-case basis, just like the parties agreed to determine the correct amount of cash benefits to be paid to the Plaintiffs for certain other covered procedures by using the "Schedule of Operations" contained in the policy. Thus, the Fourth Circuit's definition of the term "actual charge" in *Ward* does not operate to provide the Plaintiffs

with an unexpected gain; instead, it constitutes the Plaintiffs' expected return on their premium investment.

Because compliance with the statutory provision is optional for an insurance company issuing specified disease policies and because there has been no showing that the Plaintiffs' and Fourth Circuit's definition of "actual charge" has the effect of making specified disease policies unaffordable to South Carolina residents, the court does not find that section 38-71-242, as retroactively applied to the Plaintiffs' policies, serves the legitimate public purposes presented by the Defendants. Defendants argue that the General Assembly has the authority to modify a court's interpretation of a term, which the court certainly agrees. But when it does so in a manner that retroactively modifies existing contractual obligations, such legislation runs the risk of violating the Contract Clause. And the court finds that section 38-71-242 does so in this case.

Therefore, the court grants the Plaintiffs' motion for summary judgment with respect to its declaratory judgment cause of action, as the court finds that section 38-71-242 does not apply to the Plaintiffs' insurance policies, which were issued before the statute's enactment date, because such application violates the Contract Clause of the United States Constitution. In accordance with this finding, the court also grants the Plaintiffs' motion for summary judgment with respect to their breach of contract cause of action, as the Defendants breached the terms of their insurance policies with the Plaintiffs by not paying them benefits equal to the amount their medical providers charged them for cancer treatment services in accordance with the Fourth Circuit's first decision in *Ward*.

The court denies the Defendants' cross-motion for summary judgment with respect to these claims.

## II. Novation Defense

Defendant Dixie National Life Insurance Company asserts the additional defense of novation to the Plaintiffs' breach of contract cause of action, and it moves the court for an entry of such a judgment as a matter of law, based on its belief that an implied novation extinguished its liability under the policies at issue. "A novation is a mutual agreement between all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor." *Adams v. B & D, Inc.*, 297 S.C. 416, 419, 377 S.E.2d 315, 317 (1989). "The circumstances attending the transaction alleged to be a novation must show the intention to substitute a new obligation in place of the existing one," *Wellman, Inc. v. Square D Co.*, 366 S.C. 61, 620 S.E.2d 86, 92 (Ct. App. 2005), and "[t]he party asserting a novation has the burden of proving it." *Moore v. Weinberg*, 373 S.C. 209, 644 S.E.2d 740 (Ct. App. 2007). "In order to effectuate a novation by the substitution of a new obligation, both contracting parties must consent that the new agreement is to replace the old one and their consent must be apparent." *Id.* Although a novation issue is normally a question of fact, where the party seeking to establish novation cannot produce evidence of mutual assent, no question of fact exists and the transaction does not constitute a novation as a matter of law. *American Acceptance Corp. v. Scott Housing Systems, Inc.*, 630 F. Supp. 70, 75 (E.D. Pa. 1985); *see also Security Ben. Life Ins. Co. v. Federal Deposit Ins. Corp.*, 804 F. Supp. 217, 228 (D. Kan. 1992) ("[A]fter the close of discovery on a motion for summary judgment, if the

evidence supporting a novation by implied agreement is insufficient to create a genuine issue of material fact for the jury, the moving party is entitled to judgment as a matter of law.").

The facts supporting Dixie National's motion are undisputed. The named plaintiff purchased her supplemental cancer policy from Dixie National in 1992. On December 31, 1993, Dixie National sold this policy to National Foundation Life Insurance Company via an assumption reinsurance agreement, and on February 3, 1994, National Foundation informed Ms. Montague of its assumption of her policy. The letter stated:

> Dear Policyholder,
>
> The enclosed "Assumption Certificate" is our notification to you that we have assumed your health insurance policy from Dixie National Life Insurance Company. This means that National Foundation Life Insurance Company is now responsible for servicing your policy.
>
> National Foundation Life boasts assets in excess of $59 million. Since 1973, it has devoted its energy and resources to providing financial protection against the catastrophic effects of health care costs. Today over 158,000 policyholders are availing themselves of its protection. National Foundation Life, with its financial strength, will make even more substantial the protection provided to you by you Dixie National health insurance policy.
>
> Over the years, National Foundation Life has built a reputation for prompt and courteous service. We are looking forward to providing this timely service on your behalf. In the process of acquiring your policy, we have also developed a relationship with Palmetto Marketing Associates, Inc. so they too can continue to service your policy. In the future, you should continue to direct your inquiries to:
>
> PALMETTO MARKETING ASSOCIATES, INC.
> 4921 Broad River Road
> Columbia, SC 29210
> Telephone (803) 798-0076

or if you wish you can contact our offices directly at

> NATIONAL FOUNDATION LIFE INSURANCE COMPANY
> 777 Main Street, suite 900
> Fort Worth, Texas 76102

or call us toll free at 1-800-221-9039.

We would like to take this opportunity to welcome you as a National Foundation Life policyholder and to assure you that we will strive to meet your health insurance needs now and in the future.

(Def. Mot. for S.J., Ex. C.)  National Foundation also provided Ms. Montague with an

assumption certificate, which stated:

## ASSUMPTION CERTIFICATE

. . . .

This is to certify that as of 12:01 a.m. (standard time at the address of the owner of the above captioned policy or contract) on December 31, 1993, NATIONAL FOUNDATION LIFE INSURANCE COMPANY, a Delaware stock insurance company hereby assumes all liability for performance of the terms of the policy identified above and issued by Dixie National Life Insurance Company, a Mississippi stock insurance company, the same as if it had been originally issued by NATIONAL FOUNDATION LIFE INSURANCE COMPANY.

The acceptance of this Certificate or the payment of premiums to NATIONAL FOUNDATION LIFE INSURANCE COMPANY by the owner of said policy or contract will not serve as a waiver or release of any rights the owner may have under said policy or contract.

. . . .

## IMPORTANT

This certificate becomes a part of your policy and should be attached thereto. All correspondence and inquiries should be directed to:

40

NATIONAL FOUNDATION LIFE INSURANCE COMPANY
777 Main Street, Suite 900
Fort Worth Texas 76102

(Def. Mot. for S.J., Ex. D.) After receiving this certificate, Ms. Montague did not object to National Foundation's assumption of her policy, and she began making her premium payments to National Foundation, rather than Dixie National. Because Ms. Montague continued making her premium payments to National Foundation for 17 years after her policy transferred insurers, Dixie National contends that this conduct implied her consent to a novation, thereby relieving Dixie National of any obligation it had under Ms. Montague's policy. To support its motion, Dixie National directs the court's attention to a decision of the Minnesota Supreme Court, *Epland v. Meade Ins. Agency Assocs., Inc.*, 564 N.W.2d 203 (Minn. 1997), as well as one from the Wisconsin Supreme Court, *State Dept. of Pub. Welfare v. Central Standard Ins. Co.*, 120 N.W.2d 687 (Wis. 1963).

In opposing Dixie National's motion, Ms. Montague contends that she never agreed to form a new contract with National Foundation because the assumption certificate she received only informed her that the National Foundation assumed the responsibility for servicing her existing policy. She further argues that her continued payment of premiums despite knowledge of National Foundation's assumption of her policy did not constitute an implied novation because the letter and assumption certificate provided to her were merely form letters rather than the product of negotiations. Lastly, Ms. Montague directs the court's attention to the fact that the assumption certificate does not purport to create a new agreement between her, as the policyholder, and National Foundation; rather, the certificate stated: "The acceptance of this Certificate or the

payment of premiums to [National Foundation] by the owner of said policy or contract will not serve as a waiver or release of any rights the owner may have under said policy or contract." The assumption certificate also instructed her to attach the certificate to her policy, as it was now a part of her policy. Therefore, Ms. Montague contends that she never consented to the formation of a new contract with National Foundation and that the facts discussed herein evidence only an assignment of rights and obligations and not a novation. Therefore, she asks the court to deny Defendant Dixie National's motion for summary judgment.

After considering the parties' respective positions, the court denies Dixie National's motion for summary judgment. As already noted, "[t]he circumstances attending the transaction alleged to be a novation must show the intention to substitute a new obligation in place of the existing one," *Wellman, Inc. v. Square D Co.*, 366 S.C. 61, 620 S.E.2d 86, 92 (Ct. App. 2005), and the court finds that Dixie National has not met its burden of establishing the intention of Ms. Montague to release Dixie National from liability under the terms of the policy it issued her. Neither the letter nor the assumption certificate informed Ms. Montague that the payment of premiums to National Foundation would be releasing Dixie National from its obligations under the policy it issued her. Rather, the language of the assumption certificate suggests the intent of the transaction to be the opposite: "The acceptance of this Certificate or the payment of premiums to [National Foundation] by the owner of said policy or contract will not serve as a waiver or release of any right the owner may have under said policy or contract." (Def. Mot. for S.J., Ex. D.); *see also Superior Auto. Ins. Co. v. Maners*, 261 S.C. 257, 263, 199 S.E.2d

719, 722 (1973) ("[T]o ascertain the intention of an instrument resort is first to be had to its language, and if such is perfectly plain and capable of legal construction, such language determines the force and effect of the instrument.").[3]

Moreover, neither the letter nor the certificate informed Ms. Montague that she could object to the assumption of her policy by National Foundation. In fact, National Foundation notified her that its assumption of her policy had occurred approximately one month prior to her receiving its certificate, indicating to Ms. Montague that it was a completed transaction for which she could not, and certainly did not, have a voice in the matter. This perceived, if not actual, absence of a meaningful opportunity to participate in the decision regarding the ownership of her policy undermines any argument that Ms. Montague implicitly consented to the release of Dixie National from any liability under her policy by failing to tender an after-the fact objection to National Foundation's assumption of her policy or by making premium payments to National Foundation for approximately 17 years. Therefore, the court finds that the consent necessary to affect a novation was not apparent in this case, and Dixie National has failed to establish its

---

[3] *Compare Security Ben. Life Ins. Co. v. Federal Deposit Ins. Corp.*, 804 F. Supp. 217, 228–29 (D. Kan. 1992) ("The controlling element with respect to the existence of a novation is the intention of the parties, and unless there is a clear and definite intention on the part of all concerned to extinguish the old obligation by substituting the new one . . . , a novation is not effected. The mere fact that a creditor, with knowledge of the assumption by a third party of his debtor's obligation, consents thereto, does not amount to a novation releasing his original debtor or extinguishing the original debt."), *with Epland v. Meade Ins. Agency Assocs., Inc.*, 564 N.W.2d 203, 205 (Minn. 1997) (finding that the insureds consented to a release of the original insurer from its obligation under an insurance policy when the insureds made payment of premiums to the new insurer that assumed their policy and the assumption notice informed the insureds that sending payments to the new insurer would be consenting to a release of the original insurer from any liability on the policy).

defense of novation as a matter of law. The court denies its motion for summary judgment.

### III.    Injunctive Relief

Plaintiffs also move the court for injunctive relief. To obtain a permanent injunction, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citation omitted). Here, the court finds that the Plaintiffs have an adequate remedy in law and in equity through their breach of contract and declaratory judgment claims; therefore, it denies their motion for injunctive relief. There has been no showing that, after this court's ruling, there will be any future conflicts between the Plaintiffs and the Defendants with respect to the insurance policies at issue. Moreover, the Defendants would face the serious risk of being liable for a bad faith refusal to pay claim if it acted contrary to a court's order. Therefore, the court denies the Plaintiffs' motion for summary judgment as to its claim for injunctive relief and grants the Defendants' motion for summary judgment.

IV.    **Damages**

Lastly, the Plaintiffs move for an award of damages based on the Defendants' breach of the terms of their insurance policies. Because the court has found that the Plaintiffs are entitled to be paid benefits based upon the amount billed by their medical providers, the court further finds that the Plaintiffs are entitled to damages. In an effort to assist with the calculation of those damages, the Plaintiffs have provided the court with the spreadsheet of damages suffered by the fifty-eight members of the class. (Plfs.' Mot. for S.J., Ex. B.) According to the Plaintiffs' expert, the Plaintiffs have suffered approximately $3,322,783.99 in damages, including prejudgment interest.

The Defendants do not offer any expert testimony to counter the Plaintiffs' damages calculation. They do, however, argue that any award of damages to the Plaintiff should take into account the fact that several of the class members are Medicare patients, who received benefits in accordance with the Medicare-approved amount, and the fact that the Plaintiffs' would have paid higher premiums than they actually paid to offset the "increased" benefit payments. At the hearing held before the court, the Defendants acknowledged that they made these identical arguments in the *Ward* litigation and lost on both points. In *Ward*, the Fourth Circuit determined that "there is no good reason to treat class members covered by Medicare any differently from class members covered by private insurance" when "actual charges" is understood to be the amount the medical provider initially billed the Medicare patient for his or her services. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 181 (4th Cir. 2010). The Fourth Circuit further rejected the Defendants' request to reduce the damages award by an amount equal to the higher

premium the Defendants claim they would have made the Plaintiffs pay for the same supplemental coverage. *Id.* at 182–83. The court of appeals found such an argument to be speculative and dubious, based on the fact that the Defendants originally paid benefits under the policies equal to the amount medical providers billed the insureds. Accordingly, the court again rejects the Defendants' arguments, and awards the Plaintiffs damages. The court will refrain from entering its judgment in this case until June 20, 2011, and the Plaintiffs are ordered to submit to the court their expert's pre-judgment interest calculation assuming final judgment will be entered on that date.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.

June 8, 2011                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                        United States District Judge